## CUSTODY OF A MINOR.

Hampden.    October 17, 1977. — December 23, 1977.

Present: KEVILLE, ARMSTRONG, & BROWN, JJ.

*Minor,* Custody.    *Parent and Child,* Custody of minor.

In a proceeding on a petition to transfer custody of a small child from her parents to the Department of Public Welfare, the judge's findings as to the mother's mental and emotional condition and the child's long separation from her mother sufficiently supported his award of custody to the department. [745-747]

In a proceeding on a petition to transfer custody of a small child from her parents to the Department of Public Welfare, the judge did not err in deciding the case on the basis of the conditions prevailing at the time he decided it, regardless of the absence of those conditions when the petition was brought. [747-749]

PETITION filed in the Springfield Juvenile Court on February 22, 1973.

Upon appeal to the Superior Court the case was heard by *Moriarty,* J.

---

*Lynne Hans* for the appellant.

*Diane Webster Brady,* Regional Counsel, for the Department of Public Welfare.

*Robert D. Fleischner* for the minor.

ARMSTRONG, J. This petition was brought and tried in the Springfield Juvenile Court under G. L. c. 119, § 24, and was thereafter retried in the Superior Court pursuant to G. L. c. 119, § 27. The petition sought transfer of custody of a small child from her parents to the Department of Public Welfare (department). The child's mother appeals from a judgment of the Superior Court granting the petition. We affirm.

The Superior Court judge entered lengthy and detailed findings about the tragic sequence of events which culminated in the judgment appealed from. The mother does not challenge those findings, but contends only that they required a contrary result as matter of law. Because of the rather limited scope of her arguments in support of that contention, we believe that no purpose would be served by our summarizing the facts found in other than a highly abbreviated fashion.

At the time of the child's birth in December, 1972, her mother was a divorcee and was living with the child's father, by whom the mother had previously borne a boy who had been taken from her and placed in a foster home. In February, 1973, the present petition was brought, and temporary custody of the younger child was granted to the department, which placed the child in a foster home. An investigator appointed by the Springfield Juvenile Court filed a detailed report in November, 1973, in which he described the conditions under which the child's parents were then living and concluded that the mother would be incapable of making a good home and caring for the child. A court psychiatrist examined the mother the following month and arrived at the same conclusion, characterizing the mother as "a troubled woman" who suffered from schizophrenia. In January, 1974, the Juvenile Court adjudged the child to be a "neglected" one and ordered her

committed to the department. The mother appealed to the Superior Court.

After a series of hearings before a judge of the Superior Court in December, 1974, an interlocutory order was entered whereby the parties were directed to devise a plan for the eventual return of the child to her parents. Such a plan was prepared, calling for a series of visits of increasing duration, to the end that the parents and child would become sufficiently adjusted to the change that the child could be returned to them permanently within about one year. The plan was implemented and appeared to be proceeding with qualified success (the child at all times vigorously resisted overnight separations from her foster parents) until the child was delivered to the parents on a permanent basis on June 10, 1975. Two days later the mother made a telephone call to the department in which she reported (apparently without basis) that the father had locked her out of their apartment, keeping the child with him, and she requested that the department come and get the child. The department did so and returned the child to the foster home at which she had been living almost continuously since 1973.

The child's mother and father had married in May, 1974, but had separated from time to time thereafter. They separated permanently in July, 1975. The mother failed to cooperate with a psychiatrist appointed by the court at about that time.

As of October 3, 1975, when the trial judge entered his findings, the child was happy and content in her foster home, and her foster parents had expressed an interest in adopting her. She was then almost three years old.

On the basis of his findings, the judge drew conclusions, set out more fully in the margin,[1] that there had been no

---

[1] "I have reluctantly come to the conclusion that [the mother] lacks the emotional stability necessary to enable her to establish a proper home for [the child]. Although she has, I think, made a substantial effort to establish such a home and to equip herself to care for the child, events have proved that Dr. Bernstein's [the psychiatrist appointed by the Springfield Juvenile Court] diagnosis was correct and

legal basis for transferring custody of the child to the department at the time the petition was filed in the Juvenile Court but that, nevertheless, at the time of his decision, the parents were unfit to provide the child with proper care, the child was in need of care and protection, and the best interests of the child would not be served by returning her to the care of her parents. Accordingly, the judge ordered that the child be committed to the custody of the department until she should reach the age of eigh-

that she is the victim of some thought disorder which renders her unable to cope with the stresses inherent in the role of wife and mother. That inability makes it extremely unlikely that she will be able to establish a stable marriage with [her husband] or a stable home environment for [her daughter].

'  "I am not convinced that [the mother] would not have been able to adapt satisfactorily to the role of motherhood if the child had not been taken from her in the first instance. It is at least conceivable that she could have gradually overcome her emotional difficulties by force of experience and necessity if left to her own devices, and the extent to which the events of the past 2½ years are responsible for her present emotional state is a matter of conjecture.

"Be that as it may, the events of the past 2½ years cannot be ignored. [The child] is no longer a small infant. She is now a 2½ to 3 year old-child who has not known her natural parents for most of her lifetime and who has developed strong emotional ties in her foster home. Removal of the child from the foster home to the home of her parents would be a difficult transition under the best of circumstances. In view of [her mother's] condition, it is, I am afraid, impossible. I am convinced that to remove [her] from the custody of the [d]epartment to the custody of her parents at this time would not be in the best interests of the child. . . .

"I find that so much of the allegations of the petition as allege that [the child is one] whose parents are incompetent to provide her with proper care has been proved, and that at least as of this date the child is in need of care and protection." (The petition also alleged that the child was "without necessary and proper physical, educational or moral care and discipline . . . growing up under conditions or circumstances damaging to said child's sound character development . . . [and] lack[ing] proper attention of her parent who has the care and custody . . . of said child . . . .")

The judge expressly ruled that "there was clearly no basis, at least as of [the date of the petition], for a finding that the baby had been 'neglected' by her mother," and stated that he was "not convinced that any of the other statutory criteri[a] set forth in G. L. c. 119, § 24, had been met" at that time. The judge also found, however, that shortly after the child's parents were married in May, 1974, they abruptly left Massachusetts for California, thereby breaking off visitation with the child, and did not return for four months.

teen or until the object of her commitment should be accomplished. The mother attacks the judgment entered pursuant to that order on two grounds.

1. The first of those grounds rests on the following statement in *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 642 (1975): "A parent cannot be deprived [of custody of a child] unless some affirmative reason is shown for doing so such as a finding of a serious problem with that parent, or of a separation so long as to permit very strong bonds to develop between the child and the prospective adoptive parents." While the *Little Wanderers* case arose in a different statutory context from the present one, we agree with the mother that the foregoing rule is equally applicable to proceedings brought under G. L. c. 119, § 24, as was this one. Indeed, § 24 expressly requires that such an "affirmative reason" exist.[2] She then argues that the only (or at least principal) "affirmative reason" relied upon by the judge in the present case was the child's long absence from her mother, and that that absence, having been caused by the actions of the department rather than by those of the parents, was not a legally sufficient reason for depriving the mother of custody.

We cannot agree. To begin with, we do not read the judge's decision as resting exclusively or even primarily upon the child's long separation from her parents. On the contrary, it is clear, we believe, that the judge based his decision almost entirely on the mother's mental and emo-

---

[2] The first sentence of G. L. c. 119, § 24, as appearing in St. 1972, c. 731, § 8, provided in material part as follows: "The ... Springfield juvenile court ... upon the petition of any person alleging on behalf of a child under the age of sixteen years within the jurisdiction of said court that said child is without necessary and proper physical, educational or moral care and discipline, or is growing up under conditions or circumstances damaging to a child's sound character development, or who lacks proper attention of parent ... and whose parents ... are unwilling, incompetent or unavailable to provide such care, may issue a precept to bring such child before said court ... and shall issue summonses to both parents of the child to show cause why the child should not be committed to the custody of the department of public welfare ...."

tional condition — "some thought disorder which renders her unable to cope with the stresses inherent in the role of wife and mother" (see n.1).

Moreover, even if the judge had found that the mother's "thought disorder," as well as her long separation from the child, had been caused by the precipitous actions of the department (we emphasize that he did not so find), we cannot accept the proposition that such an attribution of blame in the matter would have required the judge to ignore the mother's condition as found by him and return the child to her. Such an analysis might have been appropriate in a custody proceeding under G. L. c. 119, § 42, as appearing in the Tercentenary Edition,[3] or its statutory predecessors, which were of a quasi criminal nature and required "some kind of culpability in the conduct of, or at least an intentional non-performance of duty by, the parent from whose custody the child is to be taken." *Commonwealth* v. *Dee*, 222 Mass. 184, 186 (1915). General Laws c. 119, § 42, however, was repealed by St. 1954, c. 646, § 1, and replaced by G. L. c. 119, § 24, in substantially the same language previously quoted. See n.2. The purpose of the revision was summarized in one of the commission reports underlying the 1954 statute: "There are many children who must be protected from the tragedies resulting from the behavior of unfit parents ... whether this unfitness is due to their willful and culpable acts, or their inability to act properly because of their character disturbances, mental illness or defect.... The purposes of the neglect law need to be met by revised phrasing which will focus on the needs of the child who is suffering from the unfit behavior of parents ... whether or not such behavior can be found willful and culpable. Limitation or abrogation of custody rights of parents should then be decided not in terms of punishment of parent, but what

---

[3] Under § 42 a Juvenile or District Court was empowered to act "upon a *complaint* made by any person that any child under sixteen years of age within its jurisdiction, by reason of orphanage, *or of the neglect, crime, cruelty, insanity or drunkenness or other vice of its parents*," was without proper care (emphasis supplied).

is needed for protection of the child." 1952 House Doc. No. 2440 at 43. And see 1954 House Doc. No. 2636 at 13.

Thus, the rigid prosecutorial standards of the pre-1954 neglected child statute have been supplanted by tests closely akin to those which have long been applicable to other types of custody proceedings of a purely civil character. "This is not a proceeding to discipline the respondent for her shortcomings. It is not a proceeding to reward the petitioner. . . . It is a proceeding solely with reference to the custody of a little girl. The governing principle by which the court must be guided in deciding the issues raised is the welfare of the child." *Hersey* v. *Hersey*, 271 Mass. 545, 555 (1930). *Stevens* v. *Stevens*, 337 Mass. 625, 627 (1958). That principle applies even though its observance works an injustice on one or both of the child's parents. See *Surrender of Minor Children*, 344 Mass. 230, 237 (1962). We are therefore not persuaded by the analogy the mother draws in her brief between the department's actions in taking the child from its mother and the unlawful entrapment of a criminal defendant by State authorities. Nor, if it be relevant, do we believe that the judge's findings warrant the inference "that the department deliberately played a waiting game in order to weaken the mother's claim." *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 371 Mass. 651, 657 (1976).

2. The mother also challenges the judgment on the ground that the judge's findings of parental incompetence to care for the child relate to events which occurred after the petition had been brought, and that such of his findings as dealt with the situation on and before the date of the petition were to the contrary. She argues that there was no power in the Springfield Juvenile Court under G. L. c. 119, § 26,[4] or in the Superior Court under G. L.

---

[4] The relevant provisions of § 26, as amended through St. 1973, c. 1076, § 3, are as follows: "If the court finds the allegations in the petition proved within the meaning of this chapter, it may adjudge that said child is in need of care and protection and may commit the child to the custody of the department until he becomes eighteen

c. 119, § 27,[5] to grant such a petition solely on the basis of supervening events. While the pertinent statutes (see nn.2, 4 and 5) are susceptible of such an interpretation, we do not think that the Legislature so intended.

The question whether the findings contemplated by the first clause of § 26 (and hence, through incorporation by reference, by § 27) must relate back to the date of the petition is answered, in our opinion, by two other provisions of the earlier section. Under the second clause of § 26, those findings are a predicate for an adjudication that a child *"is* in need of care and protection" (emphasis supplied). The use of the present tense in that clause bespeaks a legislative intent that such an adjudication be based on the facts found to exist at the time the case is decided. See *Maddocks* v. *Contributory Retirement Appeal Bd.*, 369 Mass. 488, 493 (1976). More important, the order to be entered upon an adjudication that a child is in need of care and protection is the one which "may conduce to his best interests." It is clear from the history of the 1954 revision of these statutes, discussed earlier in this opinion, that the "best interests" test was of crucial importance to the Legislature. While the "best interests" test had appeared in the corresponding section of c. 119 prior to the 1954 revision (see G. L. c. 119, § 44, as appearing in the Tercentenary Edition), the deemphasis on parental fault effected by that revision brought the neglected child law into conformity with the general rule that in custody matters the well-being of the child is paramount. See *Surrender of Minor Children,* 344 Mass. at 237; *Clifford* v. *Clifford,* 354 Mass. 545, 548 (1968), and cases cited;

---

years of age or until in the opinion of the department the object of his commitment has been accomplished, whichever occurs first; or make any other appropriate order with reference to the care and custody of the child as may conduce to his best interests . . . ."

[5] The pertinent sentence of § 27, as appearing in St. 1954, c. 646, § 1, reads: "The . . . parent . . . may appeal from the adjudication of the court to the superior court . . . and also may appeal to said court at the time of the order of commitment in which event the entire case shall be before said court as if originally commenced therein . . . ."

Custody of a Minor.

*Vilakazi* v. *Maxie,* 371 Mass. 406, 409 (1976), and cases cited; *Baird* v. *Attorney General,* 371 Mass. 741, 752-753 (1977). The "best interests" test by its very nature requires an evaluation of the welfare of the child in reference to the present and the future. *Jenkins* v. *Jenkins,* 304 Mass. 248, 250 (1939). *Little Wanderers* case, 367 Mass. at 646. *Vilakazi* v. *Maxie,* 371 Mass. at 409. Compare *Custody of a Minor,* 2 Mass. App. Ct. 68, 75 (1974). We therefore conclude that the judge was right in deciding the case on the basis of the conditions prevailing at the time he decided it, regardless of the absence of those conditions when the petition was brought.

Our conclusion is bolstered by considering the consequences of our ordering the return of the child to her mother because of the absence of grounds for the transfer of custody as of the date of the petition. Given the judge's finding as to the mother's current incompetence to afford the child proper care, we would expect the department forthwith to bring a new petition under G. L. c. 119, § 24, thereby causing the whole matter to be relitigated — in all probability with the same result as in the present case. We fail to see how such an exercise could serve any purpose other than to prolong unnecessarily the disruption of the child's life and the resolution of her future.

3. The judgment is affirmed. Neither party is to have the costs of the appeal.

*So ordered.*