## Custody of a Minor.

Plymouth. May 5, 1978. — July 10, 1978.

Present: Hennessey, C.J., Quirico, Braucher, Kaplan, Wilkins, Liacos, & Abrams, JJ.

*Res Judicata. Jurisdiction*, Care and protection of minor. *Constitutional Law*, Double jeopardy. *Minor*, Medical treatment. *Parent and Child*, Consent to medical treatment, Care and protection of minor.

A Probate Court judge's order vacating the appointment of a temporary guardian for a child in an action under G. L. c. 201, § 14, did not have res judicata effect in a subsequent action brought in a District Court under G. L. c. 119, § 24, seeking the child's commitment to the Department of Public Welfare for the limited purpose of providing necessary medical care, where the prior case was not litigated on its merits in the Probate Court and the Probate Court judge vacated the temporary guardianship only so that the matter could be litigated in the District Court. [741-742]

A complaint alleging that a child was suffering from a life-threatening illness and that the parents were expressly unwilling to provide urgently needed medical care was within the scope of G. L. c. 119, § 24, the care and protection statute. [742-743]

The Superior Court had jurisdiction under G. L. c. 214, § 1, to hear and resolve issues concerning the proper medical care for a child suffering from a life-threatening illness whose parents were expressly unwilling to provide urgently needed medical care. [743-745]

There was no merit to a contention that a Superior Court judge allowed the respondents in an action under G. L. c. 119, § 24, insufficient time to present their case where they were notified of the proceedings one week before the trial and where they stipulated at trial that "all parties having an interest in the case were served notice." [745]

A judge in a care and protection proceeding under G. L. c. 119, § 24, did not err in declining to reopen the proceeding and in deciding that the reasons presented for reopening it did not outweigh the need for prompt action in a medical emergency. [745]

The doctrine of double jeopardy does not apply to care and protection proceedings under G. L. c. 119 since the proceedings are civil and not criminal in nature. [745-746]

Discussion of parental rights. [747-749]

Evidence in an action under G. L. c. 119, § 24, seeking a child's commitment to the Department of Public Welfare for the limited purpose of providing necessary medical care was sufficient to warrant findings that acute lymphocytic leukemia, with which the child was suffering, was fatal if untreated, that chemotherapy was the only available medical treatment offering hope of a cure, that the risks of the treatment were minimal when compared to the consequences of allowing the disease to go untreated, and that the child's parents were unwilling to continue the child's chemotherapy; and these findings were sufficient to meet the requirements of the care and protection statute. [749-752]

Evidence in an action under G. L. c. 119, § 24, seeking the commitment of a child suffering from leukemia to the Department of Public Welfare for the limited purpose of providing necessary medical care supported the judge's finding that chemotherapy was in the child's best interest. [753-754]

A judge's decision in an action under G. L. c. 119, § 24, to commit a child suffering from leukemia to the Department of Public Welfare for the limited purpose of providing necessary medical care was consistent with the applicable interests of the State in protecting the welfare of the children living within its borders, in the preservation of life, and in protecting the ethical integrity of the medical profession. [752-756]

CIVIL ACTION commenced in the Second District Court of Plymouth on March 23, 1978.

On appeal to the Superior Court the case was heard by *Volterra*, J., a District Court judge sitting under statutory authority.

The Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*George Donovan & John Graham* of Minnesota for the respondents.

*Stephen L. Saltonstall (Bart J. Gordon & Marvin C. Guthrie* with him) for John T. Truman, M.D.

*John H. Wyman* for the minor.

*James C. Doyle, Jr.*, for the Department of Public Welfare.

*Jonathan Brant*, Assistant Attorney General, for the Attorney General, amicus curiae, submitted a brief.

HENNESSEY, C.J.   This is an appeal by the respondent parents from a finding in the Superior Court in Plymouth County that their minor child was in need of care and pro-

tection within the meaning of G. L. c. 119, § 24, and from
an order requiring them to allow the child to undergo
chemotherapy treatment for leukemia. The case originated
in the Probate Court for Plymouth County, where, on Feb-
ruary 22, 1978, a petition was entered by the child's physi-
cian pursuant to G. L. c. 201, § 14, seeking the appointment
of a temporary guardian for the child. After hearing a brief,
unsworn statement of facts, a judge of the Probate Court
appointed a guardian ad litem for the child and granted the
relief sought. The child was brought to the Massachusetts
General Hospital (MGH) for treatment.

On March 10, 1978, the parents appeared before the Pro-
bate Court judge and moved to vacate the order of tem-
porary guardianship. The judge scheduled a hearing on the
motion for March 22, 1978, and ordered the child's physi-
cian and the guardian ad litem to file written reports.

On March 22, 1978, the judge informed counsel that, in
his opinion, the Probate Court was not the proper forum in
which to litigate the issues raised. The judge suggested that
the more appropriate route was through a care and protec-
tion petition brought in the juvenile session of a District
Court pursuant to G. L. c. 119, § 24.

On March 23, 1978, the child's physician filed such a
petition in the Second District Court of Plymouth seeking
the child's commitment to the legal custody of the Depart-
ment of Public Welfare (DPW) for the limited purpose of
providing necessary medical care. On March 29, 1978, after
considering testimony of witnesses and the report of the
court-appointed investigator, the District Court judge dis-
missed the petition.

The petitioner and the child's court-appointed counsel
appealed to the Superior Court, where, pursuant to G. L.
c. 119, § 27, a trial de novo was held. In his decision of
April 18, 1978, a Superior Court judge found that a "denial
of the recommended medical treatment means certain
death for the minor, whereas continuation of such treat-
ment offers him substantial hope for life." Concluding that
the child's "right to live" and the "state's duty to enforce

that right" outweighed the family's interests in privacy and
autonomy, the judge found the child in need of care and
protection, and ordered the child committed to the legal
custody of the DPW for the purpose of receiving chemother-
apy. Physical custody remained with the parents so long as
they obeyed the order of the court.

The parents primarily argue on appeal that the Superior
Court order violates their constitutional rights to choose the
type of medical treatment appropriate for their child. The
parents challenge the judge's findings and order on pro-
cedural grounds as well, arguing that (1) the issue of their
fitness as parents was previously determined in their favor
in the Probate Court, and as such, was res judicata; (2) the
Superior Court lacked subject matter jurisdiction; and (3)
they received inadequate notice of the Superior Court pro-
ceedings. The father further asserts that the trial de novo in
the Superior Court exposed him to double jeopardy.

We conclude that the procedural issues raised by the re-
spondents constitute no ground for reversal of the Superior
Court order. As to the substantive issues, we conclude that
this record does not properly present the question posed by
the parents on appeal whether the State constitutionally
may intervene when parental decisions concerning a child's
medical treatment represent a choice among various benefi-
cial alternatives. According to the testimony adduced at
trial, it was the parents' intention to disallow chemotherapy
regardless of whether an alternative treatment program
consistent with good medical practice could be found.

*Essentially, the judge's findings, which we affirm here,
are that there is a substantial chance for a cure and a normal
life for the child if he undergoes chemotherapy treatment.
The uncontradicted medical testimony supports those con-
clusions, and no evidence of any alternative treatment con-
sistent with good medical practice was offered.*[1]

---

[1] It is only in their brief on appeal that the respondents offer any factual
material attempting to prove the existence of effective alternative treat-
ment programs for children suffering from leukemia. Because this
material was not before the Superior Court and does not appear on the
record, it is not properly before us on review. *Currens v. Assessors of
Boston*, 370 Mass. 249, 253-254 (1976).

On the basis of this record, then, the question before the Superior Court was whether the State may intervene when parents decline to administer the only type of medical treatment which evidence before the court indicates could save their child's life. We affirm the judge's resolution of this issue. While recognizing that there exists a "private realm of family life which the state cannot enter," *Prince* v. *Massachusetts*, 321 U.S. 158, 166 (1944), we think that family autonomy is not absolute, and may be limited where, as here, "it appears that parental decisions will jeopardize the health or safety of [their] child." *Wisconsin* v. *Yoder*, 406 U.S. 205, 234 (1972).

The facts are as follows. On the evening of August 30, 1977, the child, then twenty months old, awoke with a temperature of 106°. The parents, who were living in Hastings, Nebraska, at the time, immediately brought the child to their family physician. Suspecting that the child had leukemia, the physician referred the family to Omaha University Medical Center. On September 1, 1977, physicians at the medical center diagnosed the child's illness as acute lymphocytic leukemia.

In order to understand the implications of this diagnosis for the child, a more general discussion of the disease and its treatment, as excerpted from the record before us, is helpful. Acute lymphocytic leukemia is a disease of the blood characterized by the appearance in the lymph tissue of excessive numbers of white cells and abnormal cells. The disease is attended by such symptoms as enlargement of the lymph glands, internal bleeding, anemia, and a high susceptibility to infection. Left untreated, the disease is fatal. See generally, Schmidt's Attorneys' Dictionary of Medicine, L-37, L-38, L-87, L-88 (1977).

According to uncontroverted medical evidence in this record, the only known medically effective treatment for acute lymphocytic leukemia is chemotherapy, an aggressive three-year treatment program administered in three distinct phases. The first phase is of four weeks' duration, and focuses on killing leukemia cells in the body. In this phase,

different antileukemia drugs are administered in combination: first, so that the leukemia cells may be attacked at different points in the cell division cycle, and, second, so that the leukemia cells do not develop a resistance to any one drug. The patient in this phase receives two different types of antileukemia drugs, one in the form of weekly injections, and another in the form of daily oral dosages.

The second phase of chemotherapy treatment is six weeks long. In this phase, new antileukemia drugs are introduced: During the first ten days, a drug called L-Asparaginise is administered intravenously each day; on the eleventh day, and for each successive day during the three-year treatment, a drug called 6-Mercaptopurine is taken orally.

This second phase of chemotherapy also focuses on attacking leukemia cells which may have migrated into the spinal fluid and which, therefore, may be outside the reach of the antileukemia drugs which are administered intravenously or by injection. In some treatment programs, cranial radiation is used to attack leukemia cells that may have invaded the central nervous system. In other treatment plans, a drug called Methotrexate is injected directly into the spinal fluid each week. Thereafter, the drug is taken weekly in pill form until the conclusion of the three-year treatment.

The third phase of chemotherapy is a maintenance period, which continues until the three years have elapsed. Once during each month of this phase, the patient visits the hospital and receives another combination of antileukemia drugs, one in the form of an intravenous injection, and one in the form of an oral dosage taken each day for one week.

According to the experience of the medical experts in this case, the effect of this type of treatment on the long-term survival of leukemic children has been gratifying. After one year of treatment, 90% of the children are found to be disease free. In the second year of treatment, 70% are in a state of remission. At the end of the third year, 65% are still in remission. In the fourth year the survival rate curve flattens to show a steady survival pattern of approximately 50%.

Two other factors are relevant. First, it has been shown that survival rates vary according to the type of leukemia cells found in the child. Because in this case the child is afflicted with a "null-cell" type of leukemia, his chances of survival with chemotherapy are slightly higher than 50%. Second, because the child falls within an age group which has a higher probability of potential cure and long-term survival, the chances for successful treatment in his case are stronger.

The child was admitted to a hospital in Omaha on September 1, 1977, and began a program of intensive chemotherapy which anticipated the use of antileukemia drugs and cranial radiation. By September 30, 1977, a bone marrow test indicated that the leukemia was in a state of remission.

In part because of an aversion to the use of cranial radiation in the child's treatment program, the parents determined in late September that their child's well-being would be best served if the family returned to the father's home town of Scituate, Massachusetts. The parents made this move on October 8, 1977.

On October 13, 1977, the family consulted the petitioner, Dr. John T. Truman, Chief of Pediatric Hematology Unit of MGH. After the physician both advised the family that cranial radiation would not be necessary and discussed the chances for cure with chemotherapy, the parents placed the child in Dr. Truman's care. During this visit, Dr. Truman acceded to the parents' request to administer chemotherapy in conjunction with a diet of distilled water, vegetarian foods, and high dosages of vitamins. He explained, however, that while such a diet could be used in addition to chemotherapy, it would have absolutely no value when used alone in the treatment of leukemia.

The child's treatment at the hospital included injections of a drug called Vincristine and spinal injections of Methotrexate. Additionally, the parents were instructed to administer a daily 6-Mercaptopurine tablet. During this phase of treatment, bone marrow tests indicated that the

child's leukemia was in complete remission. By the second week of November, the child had finished the more vigorous phases of the chemotherapy and the treatment had entered the long-term maintenance phase.

As a result of the treatment, the child did develop certain side effects, such as stomach cramps and constipation, but these discomforts were alleviated by adjusting the dosages of medication.[2] Additionally, the parents testified to certain short-term behavioral changes in the child, but, in the opinion of the judge, there was no evidence linking these changes to the chemotherapy.

On November 7, 1977, during one of the child's regular monthly visits to MGH, the parents directed Dr. Truman not to administer the scheduled Vincristine injection. Dr. Truman reluctantly agreed, and suggested the use of another drug which would involve no injections. A discussion followed, during which the parents asked Dr. Truman what would happen if chemotherapy were terminated. Dr. Truman informed the parents that the chance of relapse in these circumstances was 100%.

By November 10, 1977, the parents stopped giving the child his daily 6-Mercaptopurine tablets. Neither Dr. Truman nor any other medical personnel at MGH were informed of this decision. Monthly visits to the hospital continued as scheduled, however.

During the January hospital visit, Dr. Truman noted changes in the child's condition which suggested that he might not be receiving enough medication. Dr. Truman asked the mother if there had been any difficulty in administering the 6-Mercaptopurine pills. The mother replied that there had been no difficulties, and told Dr. Truman that she needed a new prescription for the medication.

---

[2] There was medical testimony that the child had *not* suffered from many of the possible side effects associated with antileukemia drugs, which side effects include: temporary loss of hair, numbness of fingers and toes, back and joint pain, sleepiness, headaches, stiffness of the neck, and irritation of the tissues surrounding the spinal cord.

On February 17, 1978, the parents again brought the child to MGH. The child was pale, was running a temperature, and had developed a cold. Dr. Truman observed that the child's liver was enlarged and that he had developed small hemorrhages under his arm. A blood study revealed the presence of 4 % leukemia cells. The disease had recurred. After a series of conversations between the parents and Dr. Truman, the mother admitted that they had stopped the child's medication more than three months before.

During the following four days, Dr. Truman repeatedly telephoned the parents, attempting to persuade them to resume the child's treatment. Dr. Truman told them that the chance of cure, while diminished by their cutoff of therapy, still existed, and that their refusal to resume therapy placed a legal responsibility on him as the child's physician. Nevertheless, the parents declined to treat the child.

On February 22, 1978, the child was brought to MGH pursuant to an order of temporary guardianship issued by the Probate Court. Chemotherapy was resumed, and as a result, the child's leukemia was again brought into remission. At present, the child continues his treatment program by order of the Superior Court.

## I. Procedural Issues.

*Res Judicata*

The respondents contend that the Probate Court judge's order vacating the appointment of a temporary guardian has res judicata effect, and thereby precludes the petitioner from bringing the care and protection action in the District and Superior Courts. We disagree.

It is well settled that "[t]he defence of res judicata ordinarily must rest upon the fact that a judgment upon the merits had been entered in the former litigation." *Hacker* v. *Beck*, 325 Mass. 594, 597 (1950). See *Quincy* v. *Brooks-Skinner, Inc.*, 325 Mass. 406, 415 (1950). Thus, where a

prior case simply has been dismissed without an evidentiary hearing, the court in the second action must give the prior judgment res judicata effect only when the defendant "proved that . . . [the prior judgment was] rendered upon some particular ground going to the merits." *Hacker* v. *Beck, supra* at 598. Cf. *Wright Mach. Corp.* v. *Seaman-Andwall Corp.*, 364 Mass. 683, 693-694 (1974); *Fabrizio* v. *U.S. Susuki Motor Corp.*, 362 Mass. 873, 873-874 (1972); Restatement of Judgments § 49 (1942).

The respondent parents have not met their burden of proof on this issue. Although the Probate Court judge scheduled a March 22 hearing on the parents' motion to vacate the order of temporary guardianship, no formal hearing occurred on that date. According to uncontroverted evidence in the Superior Court, the Probate Court judge granted the respondents' motion to vacate the temporary guardianship only "so that the matter could be litigated in a juvenile session of the . . . District Court."[3] Clearly, then, the Probate Court judge did not dismiss the case on the merits. As a result, his order should not be given res judicata effect.

*Jurisdiction of Superior Court*

There is no substance to the respondents' argument that the Superior Court lacked subject matter jurisdiction. There are at least two statutory sources of jurisdiction in this case.

First, G. L. c. 119, § 24, as amended through St. 1977, c. 799, specifically grants jurisdiction to juvenile sessions of the District Courts to consider petitions of "any person" alleging that a child under the age of eighteen "is without necessary and proper physical . . . care . . . and whose parents . . . are unwilling . . . to provide such care." A determination of the District Court may be appealed to the Superior Court for a trial de novo under G. L. c. 119, § 27.

---

[3] We note that the Probate Court judge was incorrect in his conclusion that the Probate Court lacked jurisdiction to consider the questions raised by the parties. *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728, 755-756 (1977). The fact that the judge erred in this respect, however, does not affect our conclusions as to the respondents' res judicata claim. Restatement of Judgments § 67 (1942).

Although § 24 does not refer specifically to "lack of necessary medical care" as one permissible basis for bringing a care and protection proceeding, we think that the statutory terms "without necessary and proper physical . . . care" comprehend "lack of medical care." Indeed, in declaring the general policy of care and protection proceedings, G. L. c. 119, § 1, sets forth among its goals "insur[ing] the rights of any child to sound health and normal physical . . . development." [4] Additionally, G. L. c. 119, § 26, empowers the District Court to order "appropriate physical care including medical or dental care" where such an order appears to be in the best interests of a child adjudged to be in need of care and protection.

Here, an interested party alleged, on behalf of a child suffering from a life-threatening illness, first that, without chemotherapy, the child will die, and second, that the parents were expressly unwilling to provide the urgently needed medical care. We conclude that these allegations fall within the scope of G. L. c. 119, § 24, and that the petitioners properly invoked the District and Superior Courts' jurisdiction under the care and protection statute.

A second statutory basis of subject matter jurisdiction is G. L. c. 214, § 1, inserted by St. 1973, c. 1114, § 62. This statute grants the Superior Court "original and concurrent jurisdiction of all cases and matters of equity cognizable

---

[4] General Laws c. 119, § 1, as amended by St. 1972, c. 785, § 5, provides: "It is hereby declared to be the policy of this commonwealth to direct its efforts, first, to the strengthening and encouragement of family life for the protection and care of children; to assist and encourage the use by any family of all available resources to this end; and to provide substitute care of children only when the family itself or the resources available to the family are unable to provide the necessary care and protection to insure the rights of any child to sound health and normal physical, mental, spiritual and moral development.

"The purpose of this chapter is to insure that the children of the commonwealth are protected against the harmful effects resulting from the absence, inability, inadequacy or destructive behavior of parents or parent substitutes, and to assure good substitute parental care in the event of the absence, temporary or permanent inability or unfitness of parents to provide care and protection for their children."

under the general principles of equity jurisprudence and, with reference thereto, shall be courts of general equity jurisdiction." See generally *Cesarone* v. *Femino*, 340 Mass. 638, 639 (1960); *Boyajian* v. *Hart*, 312 Mass. 264, 266 (1942); *In re Stern*, 299 Mass. 107, 108 (1937).

Under general principles of equity jurisprudence, a court of equity has both the power and the responsibility to care for and protect all those persons who, by virtue of some legal disability, are unable to protect themselves. See, e.g., *Strunk* v. *Strunk*, 445 S.W.2d 145, 147 (Ky. 1969); *In re Quinlan*, 70 N.J. 10, 44-45, cert. denied sub nom. *Garger* v. *New Jersey*, 429 U.S. 922 (1976). Cf. *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728, 745 (1977). Further, this court has recognized that when "dealing with matters concerning a person properly under the court's protective jurisdiction, '[t]he court's action . . . is not limited by any narrow bounds, but it is empowered to stretch forth its arm in whatever direction its aid and protection may be needed.'" *Superintendent of Belchertown State School* v. *Saikewicz, supra* at 755. In light of these principles it is clear that the Superior Court as a court of general equity jurisdiction had sufficient power to hear and resolve the issues concerning the proper medical care for the child in this case, when such issues affected his very chances for survival.

Our decision in *Superintendent of Belchertown State School* v. *Saikewicz*, is not to the contrary. Although in *Saikewicz, supra* at 755, we said that "[t]he Probate Court . . . has been given the specific grant of equitable powers to act in all matters relating to guardianship," we did not say that this grant of jurisdiction was exclusive. Indeed, in referring to the powers of the Probate Court, we relied on G. L. c. 215, § 6, as amended through St. 1975, c. 400, § 55. This statute specifically provides that the jurisdiction of the Probate Court in matters relating to guardianship is not exclusive, but is concurrent with the jurisdiction of the Superior Court. Similarly, nothing in *Saikewicz* derogates from the powers of either the District or the Superior Courts

to hear care and custody proceedings under G. L. c. 119, § 24.

*Notice to the Respondents*

We do not agree with the respondents' position, presented for the first time on appeal, that the Superior Court judge allowed them insufficient time to present their case. First, we note that the respondents waived summons on the petition for care and protection of March 23, 1978. This indicates that the parents were notified of the proceeding, not hours, but one week before the trial in the Superior Court. Further, when the respondents appeared before the Superior Court judge on March 30, 1978, they stipulated that "the case is appropriately here and all parties having an interest in the case were served notice. . . . [T]he case is ready to proceed."

Second, we find no reversible error in the fact that the judge below declined to reopen the proceeding. Eight days after the close of the evidence, the attorney for the mother stated in a lobby conference that "it may be necessary for the Court to hear more evidence to find out exactly what is developing [with the child's medical treatment]." Even assuming that this statement properly constituted a motion to reopen the case,[5] the judge acted within the scope of his discretion in denying it, and in deciding that the reasons presented for opening the case did not outweigh the need for prompt action in a medical emergency.

*Double Jeopardy*

We reject the father's argument that the trial de novo in the Superior Court exposed him to double jeopardy in violation of the Fifth Amendment to the United States Constitution. In *Costarelli* v. *Commonwealth*, 374 Mass. 677, 681-682 (1978), quoting from *Green* v. *United States*, 355 U.S. 184, 187-188 (1957), we noted that: "The constitutional prohibition against double jeopardy rests on the belief that 'The State with all its resources and power should not

[5] But see, Mass. R. Civ. P. 59 (a), 365 Mass. 827 (1974), and Mass. R. Civ. P. 7 (b), 365 Mass. 748 (1974).

be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.'" See generally *Abney* v. *United States*, 431 U.S. 651, 660-662 (1977); *United States* v. *Wilson*, 420 U.S. 332, 339-344 (1975). Thus, we held in *Costarelli* that the dismissal of a criminal complaint in a District Court triggers the double jeopardy clause.

While the statutory predecessors of G. L. c. 119 were arguably of a "quasi criminal nature," "the rigid prosecutorial standards of the pre-1954 neglected child statute have been supplanted by tests closely akin to those which have long been applicable to other types of custody proceedings of a purely civil character." *Custody of a Minor*, 5 Mass. App. Ct. 741, 746, 747 (1977). As to those other types of custody proceedings, we have stated that the governing principle is not the "discipline" of the parent, but rather the "welfare of the child." *Hersey* v. *Hersey*, 271 Mass. 545, 555 (1930). *Robinson* v. *Commonwealth*, 242 Mass. 401, 403 (1922). Section 1 of G. L. c. 119 makes it clear that this principle also remains operative in the care and custody statute.[6] In proceedings under c. 119, parents are neither convicted nor subject to any sort of punishment. Because the proceedings are civil and not criminal in nature, the doctrine of double jeopardy does not apply.

## II. Substantive Issues.

Although the issue has been squarely resolved in other jurisdictions,[7] the question whether, and in what circumstances, a State may order medical treatment for a child over parental objections is one of first impression in this

---

[6] For the text of G. L. c. 119, § 1, see note 4, *supra*.

[7] See cases cited in note 8, *infra*.

Commonwealth. As one commentator points out, the issue places three sets of interests in competition: (1) the "natural rights" of parents; (2) the responsibilities of the State; and (3) the personal needs of the child. Note, State Intrusion into Family Affairs: Justifications and Limitations, 26 Stan. L. Rev. 1383 (1974). Courts which have considered the question, after balancing these three interests, uniformly have decided that State intervention is appropriate where the medical treatment sought is necessary to save the child's life.[8]

We conclude that such a decision was also warranted here. First, in determining that intervention was necessary in this case, the judge below gave due weight to the constitutional rights asserted by the parents. Second, the basis of the judge's order, a finding that the parents were unwilling to provide their child with the type of care necessary for his physical well-being, was supported by the evidence. Third, the decision below was consistent with both the best interests of the child and the applicable interests of the State.

*Parental Rights*

It is well-settled that parents are the "natural guardians of their children [, . . . with] the legal as well as moral obligation to support . . . educate" and care for their

---

[8] See, e.g., *Jehovah's Witnesses in Wash.* v. *King County Hosp. Unit No. 1,* 278 F. Supp. 488, 501 (W.D. Wash. 1967), aff'd, 390 U.S. 598 (1968); *People ex rel. Wallace* v. *Labrenz,* 411 Ill. 618, cert. denied, 344 U.S. 824 (1952); *Morrison* v. *State,* 252 S.W.2d 97 (Ky. 1952); *John F. Kennedy Memorial Hosp.* v. *Heston,* 58 N.J. 576 (1971); *State* v. *Perricone,* 37 N.J. 463, cert. denied, 371 U.S. 890 (1962); *Hoener* v. *Bertinato,* 67 N.J. Super. 517 (1961); *In re Vasko,* 238 App. Div. 128 (N.Y. 1933); *In re Clark,* 21 Ohio Op. 2d 86 (C.P. 1962); *Heinemann's Appeal,* 96 Pa. 112 (1880); *Mitchell* v. *Davis,* 205 S.W.2d 812 (Tex. Civ. App. 1947). See also *In re Sampson,* 65 Misc. 2d 658 (Fam. Ct. 1970), aff'd, 37 App. Div. 2d 668 (1971), aff'd, 29 N.Y.2d 900 (1972); *In re Rotkowitz,* 175 Misc. 948 (N.Y. Dom. Rel. Ct. 1941) (courts ordered medical treatment, even where child's condition was not life-threatening). But see, *In re Seiferth,* 309 N.Y. 80 (1955); *In re Frank,* 41 Wash. 2d 294 (1952); *In re Hudson,* 13 Wash. 2d 673 (1942) (courts refused to order medical treatment over parents' objections, where child's condition was not life-threatening, and where the treatment itself would expose the child to great risk).

children's development and well-being. *Richards* v. *Forrest*, 278 Mass. 547, 553 (1932). See *Purinton* v. *Jamrock*, 195 Mass. 187, 199 (1907). As such, it is they who have the primary right to raise their children according to the dictates of their own consciences. See *Quilloin* v. *Walcott*, 434 U.S. 246, 254-255 (1978), quoting from *Prince* v. *Massachusetts*, 321 U.S. 158, 166 (1944). *Pierce* v. *Society of Sisters*, 268 U.S. 510, 535 (1925). *Meyer* v. *Nebraska*, 262 U.S. 390, 399 (1923). Indeed, these "natural rights" of parents have been recognized as encompassing an entire "'private realm of family life'" which must be afforded protection from unwarranted State interference. *Smith* v. *Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 842 (1977), and cases cited.

In light of these principles, this court and others have sought to treat the exercise of parental prerogative with great deference. See, e.g., *Richards* v. *Forrest, supra* at 556; *Wisconsin* v. *Yoder*, 406 U.S. 205 (1972). For example, in the area of medical treatment for minors, courts have shown great reluctance to overturn parental objections to medical treatment where the child's condition is not life-threatening, and where the proposed treatment would expose the child to great risk. See cases cited in note 8, *supra*. In some cases, this has been true even where the proposed medical treatment would offer great benefit to the child. See, e.g., *In re Hudson*, 13 Wash. 2d 673 (1942).

It is also well established, however, that the parental rights described above do not clothe parents with life and death authority over their children. See *Prince* v. *Massachusetts*, 321 U.S. 158, 166-167 (1944). This court has stated that the parental right to control a child's nurture is grounded not in any "absolute property right" which can be enforced to the detriment of the child, but rather is akin to a trust, "subject to . . . [a] correlative duty to care for and protect the child, and . . . [terminable] by [the parents'] failure to discharge their obligations." *Richards* v. *Forrest, supra* at 553. *Purinton* v. *Jamrock, supra* at 201. *Donnelly*

v. *Donnelly*, 4 Mass. App. Ct. 162, 164 (1976).[9] Thus we have stated that where a child's well-being is placed in issue, "it is not the rights of parents that are chiefly to be considered. The first and paramount duty is to consult the welfare of the child." *Purinton v. Jamrock, supra* at 199. On a proper showing that parental conduct threatens a child's well-being,[10] the interests of the State and of the individual child may mandate intervention.

The standard to be applied in such circumstances is articulated in G. L. c. 119, § 24. Pursuant to this provision, a child may be taken from the custody of his parents on a showing that "said child is without necessary and proper physical . . . care" and that the parents "are unwilling . . . to provide such care." In deciding that such a showing was made here, the judge below essentially found four basic facts: (1) that acute lymphocytic leukemia in children is fatal if untreated; (2) that chemotherapy is the only available medical treatment offering a hope for cure; (3) that the risks of the treatment are minimal when compared to the consequences of allowing the disease to go untreated; and (4) that the parents are unwilling to continue the child's chemotherapy, regardless of the consequences. We conclude that these findings were supported by the evidence and were sufficient to meet the requirements of the care and protection statute.

----

[9] Additionally, while we have recognized that "there must be respect for the . . . rational decision of those parties, usually the parents, who . . . are seeking to protect the bodily integrity or other personal interest of the child," *Superintendent of Belchertown State School v. Saikewicz*, 373 Mass. 728, 746 (1977), we do not agree that parents may assert on their own behalf the privacy rights of their children. *In re Quinlan*, 70 N.J. 10, 42, cert. denied sub nom. *Garger v. New Jersey*, 429 U.S. 922 (1976). Indeed, to assert such rights in care and protection cases would assume the very question to be decided, namely, the course of action most consistent with the best interests of the child.

[10] See *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 641 (1975); *Custody of a Minor*, 5 Mass. App. Ct. 741, 745 (1977); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978).

We summarize below the evidence which supported these four basic findings of the judge.

There is no dispute that the child is suffering from a disease which, without treatment, will cause his death. There was expert testimony to the effect that, if the disease is left untreated, the child will die within one to six months.

The uncontradicted expert testimony showed that chemotherapy is now quite effective in the treatment of childhood leukemia. (See discussion of facts, *supra.*) The testimony of each expert witness clearly reflected the view that this form of treatment is not "extraordinary," in the sense that it promises merely to prolong life where there is no hope of recovery. Contrast *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728, 730 (1977). Rather, the testimony revealed that, because of gratifying medical advances in the past decade, chemotherapy now offers certain types of leukemia patients a substantial hope of cure. Thus, this form of therapy has come to be viewed as the ordinary, medically indicated treatment for acute lymphocytic leukemia in children. Moreover, according to the undisputed medical evidence, chemotherapy is the only existing form of treatment which can claim such status.

As against the medical evidence which explained the nature of chemotherapy and its degree of success there was only the mother's testimony that she "hoped" that the child could be cured without chemotherapy. There was evidence that the parents preferred a treatment program based on dietary manipulation and prayer, yet uncontradicted expert testimony revealed that the dietary program suggested by the parents had no value in the treatment of acute lymphocytic leukemia.[11] Indeed, according to the mother's testimony, the decision to terminate chemotherapy was not based on the parents' view that another medically effective form of treatment could be found. Rather, it reflected the

---

[11] We assume that the experts were commenting solely on the value of a dietary program, and intended to express no opinion as to the value of prayer in responding to this or any other disease.

parents' deep concern over the child's discomfort in the chemotherapy program, and their pessimism concerning the child's chances for cure.

In commenting on the parents' decision to terminate chemotherapy, the mother stated, "we would love for [the child] to have a full and long life. But it is more important to us that his life be full instead of long, if that [is] the way it [has] to be." Thus, the mother said that when the parents stopped administering the child's medication, "[w]e only did things we felt would be helpful in any common sense situation. We prayed. We put [the child] on a nutritious program to keep his strength up to the best of any normal parents' ability, and we observed his attitude to be much improved." In light of the evidence that in treating childhood leukemia, chemotherapy had been used with substantial success, and in light of the fact that no evidence was presented tending to show an alternative treatment consistent with good medical practice, the judge was warranted in finding that chemotherapy was the only treatment method which could offer the child a hope of cure.

There was expert testimony supporting the judge's finding that the only physical side effects the child manifested as a result of his medication were stomach cramps and constipation. Medical testimony further revealed that these physical symptoms were short-term, and easily alleviated by controlling the dosages of medication.

It can be argued that the judge took too narrow a view of the testimony concerning the child's emotional adjustment to his treatment program. Although emotional "side effects" such as fear and anxiety may not be linked to chemotherapy in any biochemical way, they may very well be the product of a treatment program requiring repeated and sometimes painful injections, particularly where the patient's understanding of the treatment program is limited.

Nevertheless, we conclude that the judge's findings on this issue were warranted by the evidence. We think that the somewhat cursory treatment of the child's emotional difficulties in adjusting to chemotherapy reflected the con-

clusion, substantiated by the record, that even these psychological "side effects" were short-term in nature, and minimal when balanced against the sure prospect of death if the chemotherapy were terminated.

There was evidence supporting the judge's finding that the parents were unwilling to provide the type of care necessary or proper for the child's physical well-being. In so concluding, we emphatically point out that this is not a case where there is any evidence that the parents wished their child any harm. On the contrary, the mother testified that she did not want her son to die, and that she only wanted what was best for him. Indeed, there was evidence that the parents had actively sought alternative treatment methods in an attempt to alleviate the child's suffering.

Nevertheless, the fact remains that no evidence of a viable alternative treatment method was presented. First, it was shown by the evidence and found by the judge that the dietary program implemented by the parents after they had decided to discontinue chemotherapy demonstrably had no value in holding the disease in check. Second, because leukemia cells in the body double in number every four days, time was of the essence in treating the child's disease. Thus, even with the parents actively seeking other alternatives, the longer the child went without effective treatment, the more seriously his condition deteriorated.

In these circumstances, the evidence supported the judge's finding that the parents' refusal to continue with chemotherapy amounted to an unwillingness to provide the type of medical care which was necessary and proper for their child's well-being. Where, as here, the child's very life was at stake, such a finding is sufficient to support an order removing legal custody from the parents, even though the parents are loving and devoted in all other respects. See generally cases cited in note 8, *supra.* Cf. *Stinson* v. *Meegan,* 318 Mass 459, 463 (1945).

*The Interests of the Child*

When considering the question of the child's individual well-being, the judge below applied the doctrine of sub-

stituted judgment. By virtue of this doctrine, a court acting on behalf of an incompetent person must first attempt to "don the mental mantle" of that person, so as to act on "the same motives and considerations as would have moved [the individual]." *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728, 752 (1977). By requiring a court to ascertain as nearly as possible the incompetent person's "actual interests and preferences," the doctrine of substituted judgment seeks to ensure that the personal decisions concerning the conduct of individual affairs remain, to the greatest extent possible, with the individual. In this way, the free choice and moral dignity of the incompetent person are recognized. See *Superintendent of Belchertown State School* v. *Saikewicz, supra* at 750 n.15.

In a case like this one, involving a child who is incompetent by reason of his tender years, we think that the substituted judgment doctrine is consistent with the "best interests of the child" test. It is true that, when applying the "best interests" test, the inquiry is essentially objective in nature, and the decisions are made not by, but on behalf of, the child. See Baron, Botsford & Cole, Live Organ and Tissue Transplants from Minor Donors in Massachusetts, 55 B.U.L. Rev. 159, 170 n.54 (1975). Nevertheless, the best interests analysis, like that of the substituted judgment doctrine, requires a court to focus on the various factors unique to the situation of the individual for whom it must act. Compare *Superintendent of Belchertown State School* v. *Saikewicz, supra*, with *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 640-641, 644 (1975). As a practical matter, the criteria to be examined and the basic applicable reasoning are the same.

We think that the evidence clearly supported the judge's finding that chemotherapy treatment was in the child's best interest. The judge found several factors weighing in favor of chemotherapy. First, the judge determined that chemotherapy offered the child not only an opportunity for a longer life, but also a "substantial" chance for cure. Second,

the judge considered the child's age, noting that chemotherapy is most effective in the treatment of leukemia in young children, ages one to nine. Third, the judge found that there was no effective alternative to chemotherapy in the treatment of childhood leukemia. Finally, the judge found that the adverse effects of chemotherapy were minimal. The treatment bore no chance of leaving the child physically incapacitated in any way. Aside from the relatively mild pain associated with constipation and injections, the child suffered no significant side effects from chemotherapy. Indeed, the judge found, after observing the child, that "but for his underlying condition he appeared to be in perfectly good health, his gait was normal, and his temperament was that of a happy two year old." With treatment, the judge found, the child will be able to attend school, to play, and "to engage in the activities of children of his age." Without treatment, the judge found, the child will certainly die.

The judge identified only two factors weighing against chemotherapy: (1) the possibility of more serious side effects in the future, and (2) the child's inability to understand the significance of the treatment. The judge concluded, however, that neither factor was substantial enough to outweigh chemotherapy. First, according to the evidence, the physical side effects of chemotherapy were found to be controlled and reversible. Second, where the treatment involved was life-saving in nature, the judge found that the child's inability to understand the temporary pain of chemotherapy could not overcome his long-term interest in leading a normal, healthy life.

*Interests of the State*

The judge below properly identified three State interests supporting his decision to order medical treatment over parental objections. First, the State has a long-standing interest in protecting the welfare of children living within its borders. See *Hersey* v. *Hersey*, 271 Mass. 545, 552 (1930); *Prince* v. *Massachusetts*, 321 U.S. 158, 165-166 (1944). Indeed, this interest "is no mere corporate concern of official authority. It is the interest of youth itself, and of the whole

community, that children be both safeguarded from abuses and given opportunities for growth into free and independent . . . [individuals]." *Prince* v. *Massachusetts, supra* at 165. Where, as here, the child's very life is threatened by a parental decision refusing medical treatment, this State interest clearly supersedes parental prerogatives. See cases cited in note 8, *supra*.

Second, the State has an interest in the preservation of life. In stressing the importance of this interest, we recognized in *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728, 742 (1977), that there is a "substantial distinction in the State's insistence that human life be saved where the affliction is curable, . . . [and] the State interest where . . . the issue is not whether, but when, for how long, and at what cost to the individual that life may be briefly extended." Here, the judge found that the medically indicated treatment program offers the child his only real chance of survival. Consequently, the State interest in the preservation of life applies with full force.[12]

Third, the State has an interest in protecting the ethical integrity of the medical profession, and in allowing hospitals the full opportunity to care for people under their control. See *Saikewicz, supra* at 743-744; *Application of the President & Directors of Georgetown College, Inc.*, 331 F.2d 1000 (D.C. Cir.), cert. denied, 377 U.S. 978 (1964); *In re Quinlan*, 70 N.J. 10, 42-51 (1976), cert. denied sub nom. *Garger* v. *New Jersey*, 429 U.S. 922 (1976); *John F. Kennedy Memorial Hosp.* v. *Heston*, 58 N.J. 576 (1971). The judge's order allowing chemotherapy is in accord with these principles.

We have recognized that, according to the prevailing views of the medical profession, "physicians distinguish be-

---

[12] While deciding that the State interest in the preservation of life is quite strong in this case, we do not decide here that this interest invariably must control in every case where State intervention is sought to order life-saving medical treatment. See, e.g., *Lane* v. *Candura*, 6 Mass. App. Ct. (1978) (376 N.E.2d 1232 [1978]) (State intrusion not warranted where decision to forgo life-saving treatment was made by a competent adult).

tween curing the ill and comforting . . . the dying; . . . they refuse to treat the curable as if they were dying or ought to die, and . . . they have sometimes refused to treat the hopeless and dying as if they were curable." *Saikewicz, supra* at 738, quoting from *In re Quinlan*, 70 N.J. 10, 47 (1976). The expert testimony established that, in the child's case, chemotherapy was more than a brief means of prolonging life — it offered the child a substantial hope for cure. To withdraw the child from his chemotherapy program, without offering an effective alternative, would be tantamount to treating him "as if he were dying." According to the child's attending physician, this emphatically was not the case. The judge's order is supported by the physician's judgment that the child's life can be saved with chemotherapy.

## Conclusion.

In affirming the judgment of the Superior Court on the basis of this limited record, we point out that under G. L. c. 119, § 26, parents have the right to petition the court "not more than once every six months for a review and redetermination of the current needs of [the] child." If the parents wish to present further evidence concerning the child's continuing well-being, they may resort to this statutory remedy.[13]

*Judgment affirmed.*

---

[13] We do not, of course, imply that the mere presentation of medical evidence of alternative treatment may necessarily be sufficient to warrant or compel a result different from that reached in the instant case. Expert testimony is not binding on the trial judge, and conflicting medical testimony may give rise to determinations by the judge as to weight and credibility of proffered evidence. See *Sevigny's Case*, 337 Mass. 747, 751 (1958), and cases cited. Nor do we reach the issue here as to the quality or quantity of evidence sufficient to warrant a conclusion that an alternative treatment exists which is consistent with good medical practice.