**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-1176**

In the Matter of the Child of: M. E. P. and T. H. V., Parents.

**Filed February 26, 2024**
**Affirmed**
**Johnson, Judge**

Wright County District Court
File No. 86-JV-23-591

Lucas J.M. Dawson, Christina Zauhar, Halberg Criminal Defense, Bloomington, Minnesota (for appellant parents)

Brian A. Lutes, Wright County Attorney, Lindsey R. Danielson, Assistant County Attorney, Buffalo, Minnesota (for respondent Wright County Health and Human Services)

John Jerabek, Tuft, Lach, Jerabek & O'Connell, Maplewood, Minnesota (for guardian *ad litem*)

Considered and decided by Johnson, Presiding Judge; Segal, Chief Judge; and Cochran, Judge.

**SYLLABUS**

1.      The district court did not err by determining that a five-year-old child with an aggressive form of cancer is in need of protection or services because his parents had rejected a physician's recommendation that the child continue to receive a chemotherapy treatment that is widely accepted for the child's type of cancer and likely is necessary for the child's survival.

2.      The district court's order requiring chemotherapy treatment for a five-year-old child with an aggressive form of cancer, over his parents' objection, does not violate the parents' constitutional rights to the care, custody, and control of their child in light of

the district court's findings that the chemotherapy treatment is well accepted in the medical community and that the child's probability of survival is more than 90 percent with the treatment and less than 20 percent without the treatment.

## OPINION

**JOHNSON**, Judge

When K.K.P. was four years old, he was diagnosed with leukemia. He began a five-phase chemotherapy treatment, which has a survival rate of more than 90 percent, as compared to a survival rate of less than 20 percent without the treatment. K.K.P.'s parents decided to discontinue chemotherapy after he had completed the first phase of the treatment. Wright County petitioned the district court for an order adjudicating K.K.P. a child in need of protection or services and an order requiring the continuation of chemotherapy. Following an emergency protective-care hearing, the district court granted interim legal custody of K.K.P. to the county, placed him in foster care with a relative, and ordered that he continue to receive the recommended chemotherapy. Later, after a four-day trial, the district court granted the county's petition and reiterated its prior orders. K.K.P.'s parents appeal. We conclude that the district court did not err by adjudicating K.K.P. a child in need of protection or services or by ordering an out-of-home placement. We also conclude that the district court's orders requiring chemotherapy do not violate the parents' constitutional rights to the care, custody, and control of their child. Therefore, we affirm.

2

**FACTS**

K.K.P. is now six years old. Before the events that precipitated this action, he lived with his mother, M.E.P., his father, T.H.V., and a younger brother, traveling as necessary for T.H.V.'s work in the oil-and-gas industry in Texas, Oklahoma, and nearby states.

In December 2022, K.K.P. and his family traveled to Wright County, Minnesota to visit relatives who reside there. On December 16, K.K.P.'s mother took him to a pediatrician because he had been ill for three weeks and she had observed swollen lymph nodes and a rash on his body. The pediatrician performed a blood test, which indicated a dangerously high white-blood-cell count. While in the pediatrician's examination room, K.K.P. became "really sleepy" and "couldn't stay awake." K.K.P. went to Children's Hospital in Minneapolis by ambulance.

At Children's Hospital, K.K.P. was diagnosed as having had a hemorrhagic stroke. He was admitted to the pediatric intensive care unit (PICU). Soon thereafter, he was diagnosed with T-Cell Acute Lymphoblastic Leukemia (T-Cell ALL), an aggressive form of cancer that likely results in death if left untreated. While in the PICU, K.K.P. underwent leukapheresis, a procedure that filters and removes white blood cells from the body, and he was given a steroid to reduce swelling in and around his brain.

K.K.P.'s treatment was overseen by Nathan Gossai, M.D., a physician with expertise in T-Cell ALL and the director of the leukemia and lymphoma program at Children's Hospital. Dr. Gossai recommended a chemotherapy treatment protocol that is associated with a 93 percent chance of survival, which K.K.P.'s parents initially approved.

As explained by Dr. Gossai at trial, the chemotherapy protocol for T-Cell ALL consists of five phases. The first phase, induction, is intended to "quickly and efficiently . . . remove the leukemia from the peripheral bloodstream, and ideally from the bone marrow," so that the leukemia no longer is detectable. The cancer is considered not detectable if 0.02 percent or fewer of the 500,000 white blood cells in a tested sample indicate the presence of the disease. Because there are billions of white blood cells in a human body, a determination that cancer is not detectable does not mean that cancer is not present in a patient's body.

The second phase of the chemotherapy treatment recommended by Dr. Gossai, consolidation, uses various medications to keep residual leukemia in the blood and bone marrow "at bay," while focusing on treating the spinal fluid through "four consecutive weekly lumbar punctures, that include the administration of chemotherapy." The third phase, interim maintenance, involves the intravenous administration of medication to treat the blood, bone marrow, and cerebrospinal fluid. The fourth phase, delayed intensification, is intended "to continue to stay ahead of a potentially evolving leukemia while treating leukemia that may well be undetectable," by utilizing "different medications on different structures, timeframes, and methodologies." The fifth and final phase, maintenance, involves oral medications given at home, intravenous medication once per month, and chemotherapy delivered via lumbar puncture once every three months.

K.K.P. began the T-Cell ALL chemotherapy treatment protocol on December 20, 2022. He was discharged from the hospital on January 10, 2023, and he completed the first phase of treatment at a Children's Hospital clinic soon thereafter. K.K.P. experienced

4

numerous side effects during the first phase of treatment, including fatigue, poor appetite, nausea, vomiting, muscle weakness (myopathy), short-term neuropathy, and irritation of the bladder (cystitis).

K.K.P. was scheduled to begin the second phase of chemotherapy treatment on January 23, 2023. But he did not begin the second phase on that date because his parents objected based on concerns about the efficacy of the treatment and the severity of its side effects. K.K.P.'s mother expressed a preference for natural remedies, and she consulted with a naturopathic doctor, Helen Healy, N.D.,[1] with whom she discussed herbs and supplements that might be used to treat K.K.P. K.K.P.'s mother discussed potential alternative therapies with Dr. Gossai, such as the use of garlic and lemon. Dr. Gossai engaged in ongoing discussions with K.K.P.'s parents about the necessity of chemotherapy treatment. He discussed "the risks and benefits of therapy," including potential side effects. He informed K.K.P.'s parents that "undertreated T-Cell disease is nearly impossible to cure and would be likely to lead to [K.K.P.'s] death." He also arranged for the parents to receive a second opinion by a Texas physician, who recommended the same course of treatment. Dr. Gossai gave the parents a few days to consider the matter, but they elected to discontinue the recommended chemotherapy treatment in favor of alternative remedies.

---

[1] A naturopathic doctor is one who is licensed by the Board of Medical Practice or its designee pursuant to chapter 147E of the Minnesota Statutes. To be licensed, a person must, among other things, "have successfully passed the Naturopathic Physicians Licensing Examination" and "completed an approved naturopathic medical program." Minn. Stat. § 147E.15, subd. 1 (2022). A naturopathic doctor may administer homeopathic medicines but not "controlled substances including chemotherapeutic substances." Minn. Stat. § 147E.05, subds. 1, 2 (2022).

Given the severity of K.K.P.'s disease and the risks of delaying treatment, Dr. Gossai filed a child-protection report with Wright County Health and Human Services on January 30, 2023. A county social worker investigated. On February 1, 2023, the social worker and a police officer went to K.K.P.'s grandmother's home (where K.K.P.'s family had been staying), gave notice that the county was taking immediate custody of K.K.P., and instructed his parents to leave the home.

On February 6, 2023, the county petitioned the district court for an order adjudicating K.K.P. as a child in need of protection or services (CHIPS). The county based its request on four statutory grounds. *See* Minn. Stat. § 260C.007, subd. 6(3), (4), (5), (9) (2022). The petition alleged that, if K.K.P. did not continue and complete the chemotherapy treatment without interruption, he likely would die. The district court conducted an emergency protective-care hearing that same day.

On February 8, 2023, the district court filed an order granting the county interim legal custody, authorizing the county to retain the placement in K.K.P.'s grandmother's home, and ordering that K.K.P. "shall follow the treatment course recommended by Minnesota Children's Hospital, effective immediately." The district court allowed K.K.P.'s parents to reside in the grandmother's home "so long as parents comply with the court's order" and allowed alternative treatments "so long as those treatments do not interfere with the medical treatments he receives at Children's Minnesota."

K.K.P.'s parents petitioned this court for a writ of prohibition to challenge the district court's order. On February 10, 2023, this court denied the petition. *In re M.E.P.*, No. A23-0198, 2023 WL 2662334, at *1 (Minn. App. Feb. 10, 2023) (order). But we

6

directed the district court to receive additional evidence at the upcoming admit-deny hearing concerning "the need for the treatment" and the reasons "why such treatment is urgent" and to "file an order addressing whether the terms of the temporary order shall continue and, if so, any modifications the district court deems appropriate." *Id.* at *2.

On February 24, 2023, the district court conducted the admit-deny hearing, at which it received seven exhibits and the testimony of five witnesses. On March 2, 2023, the district court filed a 12-page order in which it made findings of facts and conclusions of law. The district court concluded that it is in K.K.P.'s best interests "to continue with conventional treatment as prescribed by the treating physicians at Children's" and that "it is best to use an integrated approach to treatment by inviting naturopathic remedies to promote the child's comfort and parental engagement." The district court reasoned that K.K.P.'s "parents have valid concerns about the side effects of chemotherapy" but that, "after hearing the testimony from all parties, it is clear at this juncture that if [K.K.P.] does not continue with the chemotherapy regime, the side effects would become secondary concerns to those of whether he will merely survive." The district court ordered that K.K.P. "shall continue his current course of treatment as recommended by Dr. Gossai and the Children's Minnesota Hospital treatment team pending final disposition of this case" and that, "[u]pon request of the parents, Children's shall work with a naturopathic doctor selected by the parents."

The district court conducted a trial on the county's CHIPS petition on four non-consecutive days in May and June of 2023. The county called three witnesses in its case-in-chief: Dr. Gossai and two county employees.

Dr. Gossai's testimony may be summarized as follows. The five-phase chemotherapy treatment that he recommended for K.K.P. is well-accepted as the appropriate treatment for T-Cell ALL. There are no other well-accepted comprehensive treatments and no less-intrusive treatments that would treat K.K.P.'s cancer as effectively. Before the chemotherapy treatment was developed, "patients did not survive." But today, a child like K.K.P. "has a 93.1 percent chance of survival." However, "interruption of therapy at any point would lead to a significantly elevated risk of the regrowth of the leukemia, to a degree that it would no longer be treatable." The absence of detectable leukemia in K.K.P.'s body after the first phase of treatment does not mean that K.K.P. is cancer-free because "we are unable to detect all blood cells and all leukemia in the body at any given time" and "the leukemia can . . . essentially learn to evade chemotherapy." If K.K.P. had not continued to receive chemotherapy after the district court ordered it in February 2023, the leukemia "would have returned to detectable status and grown out of control." If K.K.P. does not complete the chemotherapy protocol, he will die a painful death.

Both of K.K.P.'s parents testified on their own behalf. K.K.P.'s mother, M.E.P., testified as follows. When K.K.P. was first admitted to the hospital in critical condition, she felt that she "had no option but to approve" chemotherapy treatment. She agrees that "leukapheresis and chemotherapy in [K.K.P.]'s situation were life-saving efforts," but she does not agree with Dr. Gossai's assessment that, if the leukemia returned, K.K.P. likely would die because, in her view, "kids can relapse five-plus times." She also does not agree with Dr. Gossai that K.K.P.'s cancer likely would return if he were to stop chemotherapy,

8

in part because it had not yet reoccurred. She is willing to resume chemotherapy if K.K.P.'s leukemia becomes detectable again. She did not speak with Dr. Gossai after the February 24, 2023 hearing about integrating natural remedies into K.K.P.'s treatment because she "figured it was pointless." She has "witnessed a lot of death because of chemo" and is skeptical of the higher survival rates associated with chemotherapy because people "don't die of cancer; they die of complications." She expressed concerns regarding the side effects of chemotherapy and believes there are "safer alternatives." She believes that K.K.P.'s lack of detectable cancer means that he has "no cancer to heal" and that "there's zero benefit of doing chemotherapy for three years when [K.K.P.] could take two grams of cannabis oil daily to keep [his cancer] from coming back."

K.K.P.'s father, T.H.V., testified that he wants K.K.P. to receive chemotherapy as well as natural supplements. He does not believe that it is in K.K.P.'s best interests to disregard Dr. Gossai's recommended course of treatment.

The parents called two additional witnesses. Dr. Healy testified that, in light of K.K.P.'s diagnosis, it is "definitely" in his "best interest to get conventional medical care." She also testified that naturopathic medicine can help but that chemotherapy is the best treatment for leukemia.

Uma Dhanabalan, M.D., a medical doctor with expertise in using cannabinoids as an alternative remedy to treat children with cancer, testified as follows. She agrees with Dr. Gossai that K.K.P. would be dead without the leukapheresis and the first phase of chemotherapy. She also agrees with Dr. Gossai that K.K.P. cannot be deemed cancer-free simply because the leukemia is nondetectable. She believes that "chemotherapy has to be

9

a part of [K.K.P.'s] treatment" but that additional therapies could be used as a supplement. Specifically, she believes that "cannabinoids must be an integral part of the protocol, regardless of what protocol" is used, because they will reduce side effects, improve K.K.P.'s quality of life, and help prevent relapse. She acknowledged that cannabis is not a well-accepted treatment for T-Cell ALL and that natural remedies alone cannot cure T-Cell ALL.

The guardian *ad litem* also testified. She described K.K.P. as an "extremely loving" and "happy" boy. She noted that K.K.P.'s parents currently were addressing his medical concerns but only "because there is a court order." She is concerned that K.K.P.'s parents would discontinue his treatment "to go the natural route" if they were free to do so. She believes that it is in K.K.P's best interests to "continue receiving his treatment through Children's" and that natural remedies could be integrated into the treatment plan.

In July 2023, the district court filed a 36-page order with findings of fact and conclusions of law. The district court placed emphasis on the testimony of the three medical professionals, all of whom testified that K.K.P. should continue receiving chemotherapy treatment. The district court credited Dr. Gossai's testimony about the 93-percent survival rate associated with the chemotherapy treatment and the "significantly lower survival rates" of patients who do not complete the full course of treatment. The district court stated that, without chemotherapy, K.K.P.'s "prospect for survival is very bleak." The district court also stated that K.K.P.'s parents had had an opportunity to give K.K.P. natural supplements and medical cannabis in conjunction with chemotherapy but had "not fully engaged with the process of integrating natural remedies into [K.K.P.'s]

10

care" and had failed to propose a specific naturopathic treatment plan. The district court wrote that "[t]here is no doubt that [K.K.P.'s] parents love him and want him to live" and concluded that, "in order to give [K.K.P.] the best chance of having a long life, it is in his best interests to order ongoing chemotherapy." Accordingly, the district court adjudicated K.K.P. a child in need of protection or services, ordered that he remain in the county's custody and in foster care at his grandmother's home, and reiterated its March 2, 2023 order requiring chemotherapy. The parents filed a motion for amended findings and a new trial, which the district court denied. The parents now appeal and raise three issues.

## ISSUES

I.      Did the district court err by adjudicating K.K.P. a child in need of protection or services?

II.     Do the district court's orders requiring that K.K.P. continue to receive chemotherapy as prescribed by his physicians violate K.K.P.'s parents' constitutional rights to the care, custody, and control of K.K.P.?

III.    Did the district court err by ordering out-of-home placement for K.K.P.?

## ANALYSIS

## I.

K.K.P.'s parents first argue that the district court erred by finding that the county proved the existence of statutory grounds to adjudicate K.K.P. a child in need of protection or services. The parents' first argument challenges only the CHIPS adjudication; they do not challenge the district court's orders requiring chemotherapy on statutory grounds.

11

"To adjudicate a child in need of protection or services, the county must prove, by clear and convincing evidence, the existence of one of the statutory child-protection grounds under Minn. Stat. § 260C.007, subd. 6, and that the child needs protection or services as a result." *In re Welfare of Child of H.G.D.*, 962 N.W.2d 861, 873 (Minn. 2021). In reviewing such an adjudication, we consider whether the district court's findings "address the statutory criteria[,] . . . are supported by substantial evidence and [are] not clearly erroneous." *Id.* (quoting *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008)).

In this case, the county pleaded four statutory grounds for adjudicating K.K.P. a child in need of protection or services, and the district court found that the county proved each one. *See* Minn. Stat. § 260C.007, subd. 6(3), (4), (5), (9).

The first statutory ground at issue provides that a child is in need of protection or services if the child "is without necessary food, clothing, shelter, education, or other required care for the child's physical or mental health or morals because the child's parent, guardian, or custodian is unable or unwilling to provide that care." Minn. Stat. § 260C.007, subd. 6(3). The district court concluded that the county proved this allegation by clear and convincing evidence because K.K.P. "is without required medical care necessary for his physical health due to the parents' unwillingness to follow through with the scientifically based chemotherapy treatment protocol without court order."

The district court's conclusion is supported by its detailed findings. The district court found that chemotherapy is medically necessary because K.K.P. has a "very good chance of surviving T-Cell ALL, a 93.1% chance, by completing the recommended

chemotherapy treatments," that his "prospect for survival is very bleak without additional chemotherapy," and that "ending the chemotherapy early would likely result in the return of a more aggressive scourge of cancer, which would be difficult to treat, and the process of dying would be painful." The district court found that K.K.P.'s mother was unwilling to allow K.K.P. to continue chemotherapy unless his cancer had returned. In addition, the district court found that K.K.P's father "is unwilling or unable to advocate for chemotherapy, although he believes it is necessary to save [K.K.P.]'s life," and that "[t]he parents have defaulted to [K.K.P.'s mother's] position when making decisions about ongoing treatment."

The district court's findings are supported by the evidence. Dr. Gossai testified that the five-phase chemotherapy protocol is the well-accepted treatment for T-Cell ALL, that there are no other medically accepted comprehensive treatments, and that there are no less-intrusive treatments available that would treat K.K.P.'s cancer as effectively. He further testified that "the interruption of therapy at any point would lead to a significantly elevated risk of the regrowth of the leukemia, to a degree that it would no longer be treatable," and that, without completing the protocol, K.K.P. likely would die a painful death. The two other medical professionals—Dr. Healy and Dr. Dhanabalan—also testified that chemotherapy is necessary given K.K.P.'s condition and that natural remedies alone could not cure T-Cell ALL.

The second statutory ground at issue provides that a child is in need of protection or services if the child "is without the special care made necessary by a physical, mental, or emotional condition because the child's parent, guardian, or custodian is unable or

13

unwilling to provide that care." Minn. Stat. § 260C.007, subd. 6(4). The district court concluded that the county proved this allegation by clear and convincing evidence because K.K.P. "is without the special care made necessary by a physical condition because [his parents are] unwilling to provide ongoing chemotherapy pursuant to a scientifically based, and time sensitive treatment plan, but for a court order."

The district court's conclusion on the second statutory ground is supported by its detailed findings and by the evidence for reasons that are similar to those relating to the first statutory ground. Because of his T-Cell ALL diagnosis, K.K.P. has a physical condition that requires special care (chemotherapy), and he is without that care because his parents are unwilling to allow him to receive chemotherapy treatment without a court order.

The parents' primary challenge to the statutory basis of the district court's CHIPS adjudication is their assertion that K.K.P.'s leukemia is not present or is not active. In their principal brief, they argue that "at the time of trial K.K.P. was cancer free." At oral argument, they revised that argument somewhat by asserting that the leukemia was not "active" at the time of trial. In any event, the argument is without merit in light of the evidence that, at the time of trial, K.K.P. had a cancerous condition that required treatment. Dr. Gossai testified that "nondetectable" merely means that the cancer is found in 0.02 percent or fewer of the 500,000 white blood cells in a tested sample but that the disease likely is still present in the body and likely would return if the treatment plan were not followed. Similarly, Dr. Dhanabalan—a witness who was called by the parents—testified that it is "100 percent correct" that "just because leukemia isn't detected, doesn't mean it's not there." This evidence is sufficient to satisfy the statutory standards, which require

14

"necessary" or "required care" given a child's "physical . . . health," Minn. Stat. § 260C.007, subd. 6(3), and the "special care made necessary by a physical . . . condition," *id.*, subd. 6(4).

Thus, the district court did not err by adjudicating K.K.P. as a child in need of protection or services pursuant to paragraphs (3) and (4) of subdivision 6 of section 260C.007. Only one statutory ground is necessary for a CHIPS adjudication. *H.G.D.*, 962 N.W.2d at 873. Because we have concluded that the district court did not err by adjudicating K.K.P. as a child in need of protection or services under two statutory grounds, either of which is sufficient, we need not consider the two other grounds.

## II.

K.K.P.'s parents also argue that the district court's orders requiring that K.K.P. receive chemotherapy as prescribed by Children's Hospital, over his parents' objection, violate the parents' constitutional rights based on the Due Process Clause of the Fourteenth Amendment to the United States Constitution. They acknowledge that the state has an interest in protecting children's welfare but contend that, in the circumstances of this case, the state's interest is insufficient to overcome their interests in the parent-child relationship with K.K.P.[2]

---

[2]The county argues, in part, that the parents did not preserve this argument by presenting it to the district court. As a general rule, an appellate court will consider and resolve "only those issues that the record shows were presented and considered by the trial court in deciding the matter before it." *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988). The record reflects that the district court requested proposed findings of fact and conclusions of law in lieu of closing argument. The parents presented this issue to the district court by incorporating it into the proposed findings and conclusions that they submitted. Thus, the parents properly preserved the argument for appellate review.

The Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The United States Supreme Court has recognized that the Due Process Clause "includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests," including "the interest of parents in the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion) (quotation omitted) (cited in *SooHoo v. Johnson*, 731 N.W.2d 815, 820 (Minn. 2007)). Accordingly, "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Id.* at 66.

A parent's right to the care, custody, and control of a child encompasses the right to make medical decisions on behalf of the child. *Parham v. J.R.*, 442 U.S. 584, 602-03 (1979). "Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments." *Id.* at 603. A parent's right to make medical decisions on behalf of a child co-exists with a "'high duty' to recognize symptoms of illness and to seek and follow medical advice." *Id.* at 602. Because some parents may not always fulfill that duty, "a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Id.* at 603. Consequently, parents who are otherwise fit "retain a substantial, if not the dominant, role in the decision, absent a finding of neglect or abuse." *Id.* at 604 For that reason, parents do not have "absolute and unreviewable discretion" to make decisions about medical care

16

for their children; rather, they retain their authority to do so "subject to a physician's independent examination and medical judgment." *Id.*

Neither the United States Supreme Court nor the Minnesota appellate courts have applied these principles to a case in which parents rejected a physician's treatment recommendation for a child's life-threatening illness. Our research reveals a dearth of such opinions in other states as well. We have found only one opinion in which a child's parents challenged a state's attempt to compel medical treatment over the parents' objection on the sole ground that such a court order would violate the parents' constitutional rights to the care, custody, and control of a child.[3]

In *Custody of a Minor*, 379 N.E.2d 1053 (Mass. 1978), a 20-month-old child was diagnosed with leukemia. *Id.* at 1056. At the recommendation of physicians, the child began chemotherapy. *Id.* at 1057. But the child's parents later discontinued the administration of medication in their home, without telling the treating physician and, in fact, deceiving the physician when asked. *Id.* at 1058. The trial court found that the child was in need of care and protection, appointed a temporary guardian *ad litem*, and ordered the parents to allow the child to resume chemotherapy. *Id.* at 1055-56. On appeal, the supreme court reasoned that a parent's fundamental constitutional rights "do not clothe

---

[3]We are aware of several opinions in cases in which parents challenged state intervention on the ground that an order requiring medical treatment would violate their First Amendment rights to the free exercise of their religion. *See, e.g.*, *Newmark v. Williams*, 588 A.2d 1108 (Del. 1991); *In re Guardianship of L.S. & H.S.*, 87 P.3d 521 (Nev. 2004); *In re Willmann*, 493 N.E.2d 1380 (Ohio Ct. App. 1986); *Matter of Hamilton*, 657 S.W.2d 425 (Tenn. Ct. App. 1983). We do not apply those cases here because they are based on a different legal theory.

17

parents with life and death authority over their children." *Id.* at 1063. The supreme court affirmed based on the trial court's findings that the child's disease "is fatal if untreated," that "chemotherapy is the only available medical treatment offering a hope for cure," and that "the risks of the treatment are minimal when compared to the consequences of allowing the disease to go untreated." *Id.*

The *Custody of a Minor* opinion indicates that a parent's right to make medical decisions on behalf of a child must be balanced against the state's interest in ensuring child welfare and that the proper balancing of such rights and interests in a particular case depends on the facts of the case. It so happens that the facts of *Custody of a Minor* are quite similar to the facts of this case, and the court's analysis is persuasive.

In this case, the pertinent findings are that K.K.P. has an aggressive form of cancer, T-Cell ALL. Three witnesses with medical training (including two witnesses called by the parents) testified that chemotherapy is necessary to save his life. If K.K.P. completes the chemotherapy treatment plan, he would have a 93-percent chance of survival. If he does not continue and complete the chemotherapy treatment, the cancer "will likely return." In that event, K.K.P.'s odds of survival would be less than 20 percent. This evidence supports the conclusion that K.K.P.'s parents' "'high duty' to recognize symptoms of illness and to seek and follow medical advice" should have caused them to authorize the chemotherapy recommended by Dr. Gossai. *See Parham*, 442 U.S. at 602.

The alternative scenario preferred by K.K.P.'s mother is naturopathic treatment. She believes that such treatment would cure the cancer. But the district court specifically found that K.K.P.'s mother's belief is not credible because it is contradicted by the

18

testimony of the medical professionals. The district court also found that M.E.P. had not made a specific proposal of a naturopathic treatment plan.

Given the evidence and the district court's findings, K.K.P.'s parents' constitutional rights to the care, custody, and control of K.K.P. must yield to the state's interest in protecting K.K.P.'s best interests. In this case, K.K.P.'s best interests are served by a treatment plan that is likely to save his life rather than an unspecified alternative plan that is likely to result in his death.

Thus, the district court's orders requiring chemotherapy for K.K.P. do not violate his parents' fundamental constitutional rights to care, custody, and control of K.K.P., including the right to make medical decisions on K.K.P.'s behalf.

**III.**

The parents also argue that the district court erred by ordering an out-of-home placement.

Under Minnesota law, a peace officer is authorized to take a child into immediate custody if the "child is found in surroundings or conditions which endanger the child's health or welfare or which such peace officer reasonably believes will endanger the child's health or welfare." Minn. Stat. § 260C.175, subd. 1(2)(ii) (2022). In that event, the peace officer may place the child with a relative. *Id.*, subd. 2(a). Within 72 hours, the district court "shall hold a hearing . . . to determine whether the child should continue to be in custody." Minn. Stat. § 260C.178, subd. 1(a) (2022). If the district court determines that "there is reason to believe . . . that the child's health or welfare would be immediately endangered if returned to the care of the parent or guardian who has custody and from

whom the child was removed," the district court may "order the child . . . into foster care . . . under the legal responsibility of the responsible social services agency . . . for the purposes of protective care." *Id.*, subd. 1(c), 1(c)(2). Foster care may consist of "24-hour substitute care for a child for whom a responsible social services agency has placement and care responsibility and . . . who is placed away from the child's parent or guardian in . . . foster homes of relatives." Minn. Stat. § 260C.007, subd. 18(1) (2022). This court applies an abuse-of-discretion standard of review to a district court's order for out-of-home placement. *See In re Custody of N.A.K.*, 649 N.W.2d 166, 174 (Minn. 2002); *In re Welfare of Doege*, 240 N.W.2d 562, 564 (Minn. 1976).

In this case, K.K.P. was allowed to remain in his grandmother's home when the county took immediate custody of him. After the emergency protective-care hearing, K.K.P. remained in the county's custody and in the placement in his grandmother's home, and the district court specifically allowed K.K.P.'s parents "to reside with the child's maternal grandmother and current foster provider so long as parents comply with the court's order." After trial, the district court kept the out-of-home-placement plan in place pending a disposition hearing.

The parents challenge both the pre-trial and the post-trial orders. They contend that, before the CHIPS adjudication, the district court erred by ordering a trial home visit, which they contend is not authorized by statute at that stage of a juvenile-protection matter. *See* Minn. Stat. § 260C.178, subd. 1(c)(2). This argument is based on a flawed factual premise; the district court did *not* order a trial home visit before trial. Rather, the district court

20

granted the county interim legal custody of K.K.P. and ordered the county to find a suitable out-of-home placement with a relative.

K.K.P.'s parents also contend that the district court erred by ordering foster care, which, they assert, requires that a child be "placed away from" the child's parents. *See* Minn. Stat. § 260C.007, subd. 18(a)(1). The district court did not specify where the county should place K.K.P. But the district court's grant of interim legal custody to the county effectively precluded K.K.P.'s parents from choosing where he would reside. The county chose to place K.K.P. in his grandmother's home. In its brief, the county characterizes the placement as "unorthodox." In any event, the atypical nature of the placement—a foster-care placement where a child's parents were allowed to reside, subject to conditions—was beneficial to both K.K.P. and his parents because the arrangement allowed them to reside together during a difficult time. The parents have made no assertion that they were prejudiced by the placement in the home of K.K.P.'s grandmother. Furthermore, they have not identified any statutory provision that forbids the county from making such a placement. On the other hand, the county contends that the placement in K.K.P.'s grandmother's home is consistent with a statute providing that, while in temporary protective custody, a child shall be placed "in the least restrictive setting consistent with the child's health and welfare and in closest proximity to the child's family as possible." *See* Minn. Stat. § 260C.181, subd. 2 (2022). We agree with the county that the placement challenged by K.K.P.'s parents is justified by that statute.

K.K.P.'s parents further contend that, upon making the CHIPS adjudication, the district court erred by ordering that K.K.P. remain in the same placement. The district

21

court's CHIPS order states that K.K.P.'s placement was to be "determined by the county pending the disposition hearing in this matter." The district court promptly held a disposition hearing and ordered a trial home visit. That disposition is specifically authorized by statute. *See* Minn. Stat. § 260C.201, subd. 1(a)(3) (2022). The district court record reflects that, after the dispositional hearing, the parties jointly requested that the district court allow K.K.P. and his family to relocate to Oklahoma and that the district court approved, with provisions intended to ensure that K.K.P. "receives the treatment that is necessary for him to survive, and that those services are set up in Oklahoma prior to his move."

It appears that the parents are concerned about the collateral consequences of K.K.P.'s placement, namely, that the time K.K.P. spent in that status will compel the county to file a permanency petition. The county responds by stating that, if any relief were appropriate, "the appropriate remedy would be to retroactively remove any days that were counted as out of home placement days." Because we perceive no error, we need not order a remedy. We note, however, that time spent in an out-of-home placement does not necessarily require the county to file a permanency petition. The statutory provision that might prompt a county to file a permanency petition "does not apply if there is a compelling reason approved by the court for determining that filing a termination of parental rights petition or other permanency petition would not be in the best interests of the child." Minn. Stat. § 260C.301, subd. 4 (2022). Accordingly, any party may, if necessary, seek to avoid a permanency proceeding by asking the district court to issue an order pursuant to the exception in section 260C.301, subdivision 4.

22

Thus, the district court did not err by issuing orders that allowed for the placement of K.K.P. in his grandmother's home and allowed his parents to reside with him there, subject to certain conditions.

## DECISION

The district court did not err by adjudicating K.K.P. a child in need of protection or services. The district court's orders requiring the continuation of chemotherapy do not violate K.K.P.'s parents' constitutional rights to the care, custody, and control of K.K.P. The district court did not err by allowing placement of K.K.P. in his grandmother's home.

**Affirmed.**